## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TAYLOR ENERGY COMPANY LLC**

                                                             **CIVIL ACTION**

**VERSUS**                                                      **NO. 09-6383**

**UNDERWRITERS AT LLOYD'S,**              **SECTION "K"(3)**
**LONDON SUBSCRIBING TO INSURANCE**
**COVERAGE EVIDENCED BY POLICY**
**NO. HJ109303**

### ORDER AND REASONS

Before the Court are the following motions which came for hearing on October 21, 2010:

    a.     Underwriters' Motion for Summary Judgment on Coverage (Doc. 22);

    b.     Taylor Energy Cross-Motion for Summary Judgment ( Doc. 53);

    c.     Motion in Limine of Taylor Energy Company LLC to Exclude Parol Evidence of
          Defendants' Contract Intent (Doc. 73); and

    d.     Underwriters' Motion for Summary Judgment on Plaintiff's Statutory Bad Faith
          Claims (Doc. 20).

This case arises out of the collapse of a production platform owned by plaintiff Taylor

Energy Company LLC ("Taylor Energy") and certain costs incurred by Taylor Energy as the result

of seepage from the 28 wells which were serviced by that platform.   Taylor Energy had insured

the structure and wells through defendants, Certain Underwriters at Lloyd's London and Certain

London Market and Domestic Insurance Companies ("Underwriters"), all of which severally

subscribe to certain coverage actions of Energy Package Policy No. HJ109303 ("Policy"), each for

its own proportionate share and not one for the other.   Underwriters  have moved for summary

judgment concerning the parties' existing rights and obligations under the Policy.  Specifically,

Underwriters ask the Court to issue a declaration that Section IIC of the Policy held by plaintiff Taylor Energy "does not cover costs to drill relief wells"[1] which Taylor Energy has been required by the United States to drill to stop seepage from the wells.  Thus, Underwriters maintain that Taylor Energy's breach of contract claim is without merit.  Likewise, Underwriters seek the dismissal of Taylor Energy's statutory bad faith claims.

Taylor Energy has responded with its own cross-motion for summary judgment seeking a declaration of coverage under Section IIC.  Furthermore, in conjunction with the coverage issue, Taylor also seeks to exclude parol evidence with respect to the confection of the policy as Underwriters have maintained that there is no ambiguity.

Having heard the argument of counsel and having reviewed the pleadings, memoranda, exhibits and deposition testimony presented, the Court finds for the reasons that follow that the Cross-Motion of Taylor Energy Company LLC ("Taylor") has merit as the terms of the insurance contract are unambiguous and provide coverage; that the Motion for Summary Judgment filed by Underwriters at Lloyd's London Subscribing to Insurance Coverage Evidenced by Policy No HJ109303 ("Underwriters") is without merit; that since there is no ambiguity, the Motion in Limine is moot; and that there are material questions of fact which preclude granting a motion for summary judgment on plaintiff's statutory bad faith claims.

---

[1]Underwriters initially argued that the wells in question were "relief wells" instead of "intervention wells," and that as such, the coverage for such drilling such wells had been exhausted, as will be further explained, *infra*.  Indeed, this quote is from the first paragraph of its motion. (Doc. 22 at 1).  However, in its Reply Brief, Underwriters claims that the terminology with respect "relief" versus "intervention" is a "red herring." Rather, Underwriters now posits that whatever the wells being drilled  for which plaintiff seeks coverage are called "the purpose of the wells is to prevent pollution, not to clean it up."  (Doc. 79 at 2, n.2.)  Based on this "distinction", Underwriters now argues that there is no coverage.  This position will be discussed at length herein.

**Background**

    **The Policy**

        As characterized by Underwriters, in 2003, Underwriters sold and issued to Taylor Energy

an Energy Package Policy, Policy No. HJ109303 ("the Policy") for the period September 25, 2003,

through September 25, 2004.  The policy covered Taylor's operations in the Gulf of Mexico and

elsewhere.  As characterized by counsel for Underwriters during oral argument, the language at

issue is the standard form London market "wording" for this type of coverage.  (See Rec. Doc. 88,

Transcript of Oral Argument, at 20).   Indeed, Underwriters posited that the "difference" in this

policy was that there was a $50 million special limit for Section IIC, meaning that Taylor Energy

had negotiated a higher limit under its provisions, and that Taylor Energy had also obtained

coverage for damages under the Oil Pollution Act ("OPA").  *Id.* at 21.

        The Insuring Instrument of the Policy contained four sections:

| | |
|---|---|
| Section I | Physical Damage/Removal of Wreck |
| Section II | EED (Energy Exploration and Development Insurance) |
| | (A)    Control of Well (as per Section IIA). |
| | (B)    Redrilling Extra Expense (as per Section IIB). |
| | (C)    Seepage and Pollution, Cleanup and Contamination (as per Section IIC) |
| Section III | Oil Pollution Act Coverage |
| Section IV | Loss of Production Income. |

(Doc. 22, Exh. B, The Policy docketed as Doc.  22-4 at 16 of 79) (hereafter referred to as The

Policy, Doc.  ____ at ___ of ___).[2]

---

    [2]Because of the manner in which the documents were produced to the Court and filed in the CM/ECF in globo, the Court will reference the CM/ECF document number and page as identified by CM/ECF.

The provisions that are at issue herein provide as follow:

<u>ENERGY EXPLORATION AND DEVELOPMENT INSURANCE</u>
<u>SECTION II A</u>
<u>CONTROL OF WELL INSURANCE</u>

1.      <u>COVERAGE</u>:

Underwriters agree . . . to reimburse the Assured for actual costs and/or expenses incurred by the Assured (a) in regaining or attempting to regain control of any and all well(s) . . .which get(s) out of control, but only such costs and/or expenses incurred until the well(s) is (are) brought under control as defined in Paragraph 2b of this section; and (b) in extinguishing or attempting to extinguish (i) fire above the surface of the ground or water bottom from well(s) insured hereunder . . . or from any other well(s) which are burning as a direct result of well(s) insured hereunder getting out of control.

2.      <u>DEFINITIONS</u>

a. <u>Well Out of Control</u>

For purposes of this insurance a well(s) shall be deemed to be out of control only when there is an unintended flow from the well(s) of drilling fluid, oil, gas or water above the surface of the ground or water bottom.

(1)      which flow cannot promptly be:

(a)      stopped by use of equipment on site and/or the blowout preventer, storm chokes or other equipment required by the Due Diligence and Warranties clauses herein; or

(b)      stopped by increasing the weight by volume of drilling fluid or by the use or conditioning material in the well(s); or

(c)      safely diverted into production.

or

(2)      which flow is declared to be out of control by the appropriate regulatory authority

Nevertheless and for purposes of this insurance, a well shall not be deemed out of control solely because of the existence or occurrence therein of a flow of oil, gas or water into the well bore which can, within a reasonable period of time, be circulated out or bled off through the surface controls.

     b.      <u>Well Brought under Control:</u>

          A well(s) deemed out of control in accordance with Paragraph 2a of this section shall, for the purposes of this insurance be deemed to be brought under control at the time that:

          (1)      the flow giving rise to a claim hereunder stops, is stopped or can be safely stopped; or

          (2)      the drilling, deepening, servicing, working over, completing, reconditioning or other similar operations(s) taking place in the well(s) immediately prior to the occurrence giving rise to a claim hereunder is (are) resumed or can be resumed; or

          (3)      the well(s) is (are) or can be returned to the same producing, shut-in or other similar status that existed immediately prior to the occurrence giving rise to a claim hereunder; or

          (4)      the flow giving rise to a claim hereunder is or can be safely diverted into production;

          which ever shall first occur; unless the well(s) continues at that time to be declared out of control by the appropriate regulatory authority, in which case, for the purposes of this insurance, the well(s) shall be deemed to be brought under control when such authority ceases to designate the well(s) as being out of control.

(The Policy, Doc. 22-4 at 49-50 of 79) (emphasis added).  The next relevant provision is Section

IIC which provides:

**ENERGY EXPLORATION AND DEVELOPMENT INSURANCE**
**SECTION IIC**
**SEEPAGE AND POLLUTION, CLEANUP AND CONTAMINATION**

1.     <u>INSURING AGREEMENTS:</u>

          Underwriters . . . agree to indemnify the Assured against:

          a.      all sums which the Assured shall by law or under the terms of any oil and/or gas and/or thermal energy lease and/or license be liable to pay for the cost of remedial measures and/or damages for bodily injury (fatal or nonfatal) and/or loss of, damage to or loss of use of property caused directly by seepage, pollution or contamination arising from wells insured herein;

5

b.      the cost of or of any attempt at, removing, nullifying or cleaning up seeping, polluting or contaminating substances emanating from wells insured herein, including the cost of containing and/or diverting the substances and/or preventing the substances reaching the shore;

c.      costs and expenses incurred in the defense of any claim or claims resulting from actual or alleged seepage, pollution or contamination arising from wells insured herein, including Defense Costs and cost and expenses of litigation award to any claimant against the Assured, provided, however that the inclusion of the above cost and expenses shall in no way extend the Combined Single Limit of Liability of Underwriters in Sections A, B and C of the Section II;

(The Policy, Doc. 22-4 at 52 of 79).

### The Occurrence and The Response

On September 15, 2004, Hurricane Ivan struck the Gulf of Mexico damaging an offshore production facility covered under the Policy. The facility had 28 active oil and gas wells and was located in Block 20 of the Mississippi Canyon (MC20 Facility). During the course of the hurricane, the MC20 platform and its associated wells were buried due to an undersea mudslide event during the storm. (Letter from MMS to Taylor Energy dated December 5, 2007, Doc. 36-2, page 10 of 16 ). Thus, significant damage to the platform and all 28 wells serviced by the platform occurred. (Doc. 53-3, Exh. 5, page 116 of 137, Letter from Timothy Woods, CFO of Taylor Energy to Joe McMahon of Bateman Chapman Limited[3], dated August 9, 2005) ("Letter of August 9, 2005. Underwriters were advised of the loss by e-mail on September 17, 2004. (Doc. 53-3 at 100 of 137). In that August 9th letter noted above, Taylor Energy informed Underwriters that there would be in all probability leakage if the wells were not re-entered and properly plugged and

_____

[3]Bateman, Chapman was apparently the first adjuster on this claim; however, it merged with Charles Taylor adjusting which continued to handle the subject policy.

abandoned.  Furthermore, Taylor Energy made clear in that letter that it believed that all of the coverages  under Sections IIA, IIC and III were available to defray the cost thereof. ( Letter of August 9, 2005, Doc. 53-3 at 117 of 137).

Underwriters have paid about $166 million under the various coverages of this policy. Those amounts can be summarized as follows:

**Relevant Coverage Limits and Payouts:**

| | |
|---|---|
| Section I | Physical Damage: Platform $50 million, the insured value of MC20 Platform was paid  within two weeks of the loss. |
| Section I | Physical Damage: Pipeline $5 million, the insured value of MC20 Pipeline was paid. |
| Section I | Removal of Wreck: Platform $803, 145 of $12.5 million, the removal of debris limit for the MC20 Platform (25% of the insured value), was paid.  Taylor Energy and Underwriters are still trying determine whether the remaining wreckage needs to be removed. |
| Section I | Removal of Wreck: Pipeline $2.5 million, the removal of debris limit for the MC20 Pipeline (25% of the insured value or 2.5 million, whichever is greater) was  paid. |
| Section IIA/IIB | Well Control/Redrilling $35million, limits of Section IIA, was paid. |
| Section IIC | Seepage and Pollution $6,219, 824 was paid of $50 million, the limit of Section II C |
| Section III | Oil Pollution Act $35 million, the limit of the Section III was paid. |
| Section IV | Loss of Production Income $26.2 million, the limit of the Section IV was paid. |

(See Transcript of Oral Argument, Rec. Doc. 88 at 22-23).

Thus, the only coverage that has not been exhausted is that provided by the Section IIC "Seepage and Pollution" portion of the policy.  Consequently, the issue presented is whether the actions taken by Taylor Energy to address the seepage that occurred and is occurring from these wells are covered by Section IIC of the subject policy.  A chronology of events helps inform this decision.

On October 29, 2007, a meeting occurred between Charles Taylor adjusting ("CTa"), Underwriters' adjuster, and Taylor Energy.  At that time, Taylor Energy informed CTa that the sea floor around MC20 was contaminated and that a Fugro[4] report established that pollution was emanating from one or more wells from a depth of approximately 80 feet below the current sea floor surface.  (Doc. 53-6, Affidavit of Dina Bracci Riviere, Exh. 1, at 7 of 8).  By December 5, 2007, the United States Department of the Interior, through the Mineral Management Service ("MMS") sent Taylor Energy notification that in view of the finding of hydrocarbon contaminated soil, it was ordered it "to take all actions necessary to determine the extent and source of such soil contamination and hydrocarbon sheens and **to take immediate remedial action to prevent further soil contamination and/or hydrocarbon seepage** ."  (Letter from MMS to Taylor Energy dated December 5, 2007, Doc. 36-2, page 10 of 16 ) (emphasis added).  Taylor Energy was further ordered to provide MMS "with written details of all corrective plans and procedures to be submitted to the Regional Supervisor" as well as all information concerning the MC20 to assist MMS in the determination and approval of an acceptable and feasible decommissioning plan."

---

[4]It is the Court's understanding that Fugro is a company that, *inter alia*, renders geotechnical services to the oil and gas industry.

(Letter from MMS to Taylor Energy dated December 5, 2007, Doc. 36-2, page 10-11 of 16 ).  Thus, it is clear that while  Taylor Energy would provide a plan, MMS had the ultimate authority to order whatever "remedial action to prevent further soil contamination and/or hydrocarbon seepage" it deemed to be required to be undertaken.

In 2008, after the MMS determined that typical "plug and abandon" efforts would be fruitless to fulfill [Taylor Energy's] legal obligations and a massive excavation project proved unsafe, Taylor Energy retained the services of the engineering consulting firm Boots and Coots International Well Control Inc. ("Boots & Coots") to address the problem of locating and terminating the sources of continuing seepage into the soil and the Gulf.  (Affidavit of William Pecue, President of Taylor Energy, ¶ 12,  Doc. 53-5, at 3 of 16).  Typical through well bore interventions could not be utilized as remedial measures at the MC20 Facility because the environmental conditions did not warrant their use.  Taylor Energy, working closely with Boots and Coots and MMS, therefore decided to design and utilize a proprietary design for an intervention well program to locate and stop the continuing discharges into soil and the Gulf from the MC20 Facility.   (Affidavit of William Pecue, President of Taylor Energy, ¶ 13,  Doc. 53-5, at 3 of 16).

On July 8, 2008, the United States Coast Guard sent Taylor Energy a letter which stated in relevant part that the MC20 Platform A "has a continuous, unsecured crude oil discharge" and that the discharge had been monitored since September 16, 2004 but because there was an increase:

> in frequency and quantity of oil spills at the site as well as the newly  identification (sic) of pollution point sources, it has been determined that the spill poses a significant threat to the environment.  As such further actions must be made to identify and secure the source.  **Your company is required to mitigate the impact**

> **or the potential impact of discharges to the environment, including during any recovery operations and/or well plug and abandonment operations.**

(Letter from USCG to Taylor Energy, July 8, 2008, Doc. 36-2, page 13 of 16) (emphasis added).

Then, on July 11, 2008, the United States Coast Guard sent to Taylor Energy its official "Notice of Federal Interest for an Oil Pollution Incident." This letter identified Taylor Energy as the "responsible party." It is advised that the "failure to properly carry out the removal of the discharge as ordered by the [Federal On-Scene Coordinator ("OSC") or to comply with any administrative order necessary to protect the public health and welfare, may subject you to additional penalties" with a civil penalty of up to $32,500 per day." (Letter from USCG to Taylor Energy, July 11, 2008, Doc. 53-5 page 16 of 16).

Underwriters' counsel then informed Taylor Energy's counsel, by letter dated July 15, 2008, of its position concerning coverage for the actions to be taken by Taylor Energy to control the seepage. As of that date, no relief/intervention wells had been drilled. The letter stated in relevant part:

1. Underwriters accept that evidence provided tends to establish that one or more of the wells at MC20 are flowing and that costs will be incurred (primarily through Boots & Coots) to intercept and control those wells. When Taylor incurs those costs, request for reimbursement and supporting documentation should be submitted to CTa in order that the claim can be adjusted and submitted to Underwriters for payment, subject to the terms, conditions, and limits of the Policy. Underwriters note in this regard the remaining balance under section IIA of the Policy (which covers well-control costs) is $22.8 million.

2. Underwriters accept that costs will be incurred to remove the MC20 platform from the bottom of the Gulf and when such costs are incurred, the appropriate documentation should be provided to Cta

10

for adjustment and presentation to Underwriters.  Underwriters note that the available limit on coverage for this debris removal is $12.5.

3.    With respect to coverage under Section IIC, it is unclear based on the evidence presented whether Taylor will remove, nullify or clean up pollution.   Underwriters note that further analysis of the contamination at MC20 will be undertaken but at least on suggested alternative for addressing MC20 (by Waldemar Nelson) is to do nothing allow natural sedimentation to cap the site.  If Taylor incurs no removal, nullification or clean-up expenses, then there can be no coverage under Section IIC.

Notwithstanding, Underwriters accept that if and when expenses are incurred for the removal, nullification or cleanup of pollution at MC20, such expenses would be covered under the Policy, subject to terms, conditions and limits.  If and when such expense is incurred, Underwriters suggest the appropriate evidence and support of the same be provided to CTa.  After appropriate adjustment, and subject to the policy terms and conditions, Underwriters will honor their obligations under the Policy.  Underwriters note that the limit of coverage available under Section IIC is $50 million.

4.    Regarding Section III (OPA) Underwriters note that on July 3, 2008, they were provided with a copy of a letter from the Coast Guard to Taylor that Taylor apparently received on June 30, 2008. Underwriters are considering the potential for coverage under Section III in light of the letter, and we will provide further views in this regard shortly.

(Letter from J. Clifton Hall, III [counsel to Underwriters] to Winston Rice [counsel to Taylor Energy, dated July 15, 2008, Doc. 22-8, at  3 of 8).

So, at this juncture, Underwriters established that it would consider the remedial actions to drill to intercept and control the wells to stop seepage covered under Section IIA as "control of well" costs ( of which there was only $22.8 million coverage left) and given Taylor Energy's "responsible party" status, it would now consider such costs might be covered under the Section

11

III OPA coverage.  However, as to Section IIC, it was less clear. Apparently, Underwriters favored Waldemar Nelson's suggestion of "letting the natural sedimentation [ ] cap the site" and opined that if in that way no costs, there would be no need for coverage.[5]  Moreover, it appears that at that point, as to whether Section IIC would provide coverage for the relief/intervention wells, Underwriters only cited the policy language found in Section IIC(1)(b) of the Policy on which it would determine whether the actions of Taylor Energy would come within the Policy coverage for "removal, nullification or cleanup of pollution" at MC20 **.**  This rationale would change.

In a subsequent letter dated August 13, 2008, the same counsel informed Taylor Energy that it would pay the cost of the Fugro report which was incurred to assess pollution at MC20 under the Section IIC coverage in the amount of $1,868, 572.  In addition, counsel stated:

> "costs incurred to remove debris or containers that could discharge hydrocarbons are potentially recoverable under Section III.  **Underwriters also accept that expenses incurred to drill relief wells for the wells believed to be flowing could be recoverable under Section III [OPA], if such expenses are not recoverable under the terms and conditions of Section IIA or <u>once limits under Section IIA are exhausted</u>.**

(Letter from J. Clifton Hall, III [counsel to Underwriters] to Winston Rice [counsel to Taylor Energy, dated August 13, 2008, Doc. 22-8 at 5 of 8).  Thus, clearly by its own actions, Underwriters did not view the drilling of the relief/intervention wells as exclusively recoverable under Section IIA.  Section III would be triggered at the appropriate time.

On September 23, 2008, USCG Administrative Order Number 006-08 issued under the signature of the OSC.  The Order stated, "As a result of the damage to the wells, plumes containing

---

[5]Such a position ignored the realities of Taylor Energy's dealing with the MMS and its liability under OPA.

crude oil and gas are being discharged into the Gulf of Mexico, creating a sheen on the surface of

the water."  Taylor was told to skim, conduct overflights to monitor the discharge, install pollution

domes to mitigate the discharge no later than November 1, 2008, and to provide an updated

Incident Action Plan reflecting all requirements of the order.  Failing to do so would give the Coast

Guard the right to "take all actions necessary to remove the discharge or **to mitigate or prevent**

**the threat of such a discharge** as authorized by statute.(USCG Administrative Order, September

23, 2008, Doc. 36-2 at 8 of 16) (emphasis added).

Finally, after bills for these undertakings were submitted to Underwriters' adjuster for

payment, in a June 19, 2009 letter from counsel for Underwriters to counsel for Taylor Energy,

Underwriters took the following position:

> Underwriters have agreed to the latest payment on account
> in the amount of $45 million.  This payment on Account will
> exhaust the remaining limits under Section IIA- Control of Well
> ($14.4) and Section III Oil Pollution Liability ($30.6 million).  With
> the latest payment on account, Underwriters will have paid Taylor
> a total of $160, 500,000 with respect to the Hurricane Ivan loss at
> Mississippi Canyon 20 ("MC20").

> Underwriters have previously acknowledged seepage and pollution
> coverage under Section IIC for costs associated with soil
> remediation at the MC20 site.  Additionally, Underwriters are
> reviewing the provided documentation for costs attributed to the
> pollution-dome containment system which began operation 1 May
> 2009, and if satisfied may provide Taylor with a payment on account
> under Section IIC for those expenses.

> Underwriters also understand Taylor's position to be that expenses
> for the drilling of relief wells are covered under Section IIC.
> Underwriters had not considered that position ripe for consideration
> until the limits for Section IIA and III were exhausted.  The recent
> CTa report provided that Claim Submissions 1 though [sic] 7 had

13

total relief well costs of $51,368,994.  After payment of the Eighth
Payment on Account, Underwriters have paid $53,400,000 in relief
well expenses ($8.4 million POA7 and $45 million of PA8).
Therefore, with Taylor's Submission  No. 8, the adjusted expenses
incurred to date for drilling of relief wells exceed the limits under
Sections IIA and III by $11,410, 587. [ftnt1 That is, the total
adjusted amount for relief wells ($64,810,587) minus the payments
on account for relief wells ($53,400,00 under both Section IIA and
III) equals $11,410,587)].

**Underwriters consider the costs incurred for drilling relief wells
outside the intended coverage under Section IIC because
Underwriters do not consider the drilling of the intervention
wells to be <u>remedial measures for bodily injury or loss of,
damage to or loss of use of property caused directly by seepage
pollution or contamination arising from wells insured or costs
for the removal , nullification or clean up of seepage or pollution
emanating from the insured wells</u>.**  Underwriters view the clear
intent of the Policy to be that relief wells are control of well
operations covered under Section IIA which explicitly states: "Relief
Wells are automatically held covered under this section subject to
notice to Underwriters as soon as possible and rates to be established
by Underwriters."

Underwriters acknowledge, however, that the issues presented are
unusual. Therefore, Underwriters are still considering Taylor's
position and the lead Underwriters are conferring with the following
market with regard to this loss.  As you can understand, the
immediate attention has been directed toward authorizing the recent
$45 million payment on account for the remaining limits under
Sections IIA and III.  However, Underwriters expect to have a final
answer for Taylor from all Underwriters with regard to coverage
under Section IIC for relief well costs within the next 14 days.

(Letter from J. Clifton Hall, III [counsel to Underwriters] to Winston Rice [counsel to Taylor

Energy, dated June 19, 2009, Doc. 22-8 at 7-8 of 8) (emphasis and underscoring added).

In this letter, the focus on coverage provided under Section IIC(1)(b) was abandoned.

Instead, counsel focused on the coverage language contained in Section IIC(1)(a).  Moreover,

comparing the underscored and highlighted text above, the language tracked the insuring language of Section IIC(1)(a) to the letter except a critical conjunctive/disjunctive phrase was omitted between the words "remedial measures" and "for bodily injury".  In the text of the policy, the phrase "and/or" is interposed therein, meaning that bodily injury or property damage are not necessary to trigger coverage.

On July 3, 2009, Underwriters officially declined the claim for coverage under Section IIC with respect to expenses incurred and submitted for the drilling of relief/intervention wells at MC20.  The e-mail stated in relevant part:

> Underwriters state they that do not consider the drilling of the intervention wells to be **remedial measure for bodily injury or loss of, damage to or loss of use of property caused directly by seepage, pollution or contamination emanating** from wells insured, or costs for the removal, nullification or clean up of seepage or pollution emanating from the insured  well.  That is, of course, the language which must be satisfied under Section IIC of the Policy.  The Policy Language clearly contemplates that until hydrocarbons escape from the insured wells, they are not yet seeping, polluting or contaminating substances and therefore, no coverage is afforded under Section IIC for costs incurred to stop such a flow of such substances. Rather the intent of the Policy is that efforts to stop the flow from any well (including relief wells) are control of well operations covered under Section IIA. The limit of coverage under Section IIA has now been exhausted.

(E-mail from Clifton Hall, III to Winston Rice, July 3, 2009, Doc. 36-6 at 2 of 103) (emphasis added).  Once again the conjunctive/disjunctive phrase was omitted.

As a result of this denial of coverage, the subject lawsuit was filed. Apparently more than $56 million in claims have been submitted for payment under Section IIC of the policy, sufficient to exhaust all remaining limits of coverage for that section.  None of these additional costs have been reimbursed.  Thus, it appears that there remains approximately $43.8 million in coverage to

which Taylor Energy contends it is entitled.   To date, six wells have been effectively intervened through the process outlined, and two of the three identified (primary) hydrocarbon plumes visible on the ocean surface have been eliminated as a direct result of successful intervention well operations.  (Affidavit of William Pecue, President of Taylor Energy, ¶ 14,  Doc. 53-5, at 4 of 16).

The Court will now turn to the substantive motions for summary judgment.

**Underwriters' Motion for Summary Judgment**

**Standard for Summary Judgment**

Summary judgment should be granted "if the pleadings, the discovery and the disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  *Condrey v. Sun Trust Bank of Georgia,* 429 F.3d 556, 562 (5th Cir. 2005), *citing DIRECTV, inc. v. Budden,* 420 F.3d 521, 529 (5th Cir. 2005) Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986); *Condrey*, 429 F.3d at 562.  Once the movant meets this burden, the burden shifts to the non-movant "to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial."  *Celotex* . at 322.   "[M]ere

allegations or denials" will not defeat a well-supported motion for summary judgment. Fed. R. Civ.

P. 56(e).  Rather, the non-movant must come forward with "specific facts" that establish an issue

for trial.  *Id*.


### Law with Respect to the Interpretation of Insurance Contract

This Court will apply Louisiana law so as to rule as a Louisiana court would if presented

with the same issues.  *Musser Davis Land Co. v. Union Pacific Resources,* 201 F.3d 561, 565

(5th Cir.2000), *citing Erie R. Co. v. Tompkins,* 304 U.S. 64, 79-80, 58 S.Ct. 817, 82 L.Ed. 1188

(1938); *Mozeke v. Int'l Paper Co.,* 856 F.2d 722, 724 (5th Cir.1988).  In interpreting insurance

contracts, the Louisiana Supreme Court in applying the Louisiana Civil Code has made the

inquiry clear.  As stated in *Huggins v. Gerry Lane Enterprises, Inc.*, 957 So.2d 127 (La. 2007):

> Interpretation of an insurance policy usually involves a legal question
> which can be resolved properly in the framework of a motion for summary
> judgment. *Robinson ,* 01-1697 at p. 4, 809 So.2d at 945. An insurance policy is a
> contract between the parties and should be construed using the general rules of
> interpretation of contracts set forth in the Civil Code. *Cadwallader v. Allstate
> Ins. Co.,* 02-1637, p. 3 (La.6/27/03); 848 So.2d 577, 580; *Louisiana Ins. Guar.
> Ass'n v. Interstate Fire & Casualty Co.,* 93-0911, p. 5 (La.1/14/94), 630 So.2d
> 759, 763. The judicial responsibility in interpreting insurance contracts is to
> determine the parties' common intent. La. C.C. art.2045; *Louisiana Ins. Guar.
> Ass'n,* 93-0911 at p. 5, 630 So.2d at 763; *Garcia v. St. Bernard Parish School
> Board,* 576 So.2d 975, 976 (La.1991). Words and phrases used in an insurance
> policy are to be construed using their plain, ordinary and generally prevailing
> meaning, unless the words have acquired a technical meaning. La. C.C. art.2047;
> *Cadwallader,* 02-1637 at p. 3, 848 So.2d at 580; *Carbon v. Allstate Ins. Co.,* 97-
> 3085, p. 4 (La.10/20/98), 719 So.2d 437, 439.

*Id.* at 129. The determination of whether a contract is clear or ambiguous is a question of law. *Cadwallader*, 848 So.2d at 580, *citing Louisiana Ins.Guar. Ass'n v. Interstate Fire & Cas. Co.* 03-0911, p. 5 (La. 1/14/94), 630 So.2d 759, 763., 630 So.2d at 764.

Thus, the issue presented to the Court is whether the insuring language in Section IIC(1)(a) and/or (b) unambiguously provides coverage to Taylor Energy with respect to the drilling of relief/intervention wells the purpose of which are to comply with the MMS' specific order to take immediate remedial action to prevent further soil contamination and/or hydrocarbon seepage ." (Letter from MMS to Taylor Energy dated December 5, 2007, Doc. 36-2, page 10 of 16 ).   To begin, the Section IIC is styled, "SEEPAGE AND POLLUTION, CLEANUP AND CONTAMINATION."  Note, the title of the provision is for BOTH seepage and pollution.  The act of seepage must have some bearing on coverage.  Indeed, the costs that Taylor Energy has incurred are as a result of seepage from these wells.

The Court now turns to the actual language of the Policy; the two relevant subsections as previously set forth provide:

      a.    <u>all sums which the Assured shall by law </u>or under the terms of any oil and/or gas and/or thermal energy lease and/or license <u>be liable to pay for the cost of remedial measures </u>and/or damages for bodily injury (fatal or nonfatal) and/or loss of, damage to or loss of use of property <u>caused directly by seepage, pollution or contamination arising from wells insured herein;</u>

      b.    <u>the cost of or of any attempt at, removing, nullifying </u>or cleaning up <u>seeping, </u>polluting or contaminating <u>substances emanating from wells</u> insured herein, <u>including the cost of containing and/or diverting the substances and/or preventing the substances reaching the shore;</u>

18

(The Policy, Doc.  22-4 at 52 of 79) (emphasis added).    Construing the words of these

provisions, using their plain, ordinary and generally prevailing meaning as the words are not

"technical", the Court finds that they clearly provide coverage for the relief/intervention wells.


### Subsection (a)

The initial thrust of Underwriters' argument appeared to focus on whether the wells at

issue were "relief wells" and that because Underwriters had paid out the limits for relief wells,

there was no coverage under Section IIC. Since the policy limits for relief wells provided under

Section IIA had been paid out, there was no coverage.   Thus, Underwriters' initial position was

somewhat akin to a Gertrude Stein approach to coverage, "A relief well is a relief well, is a

relief well."   At oral argument, counsel for Underwriters clarified its position.

Counsel contended that the nomenclature of the wells was irrelevant and that

Underwriters agreed that the purpose of these wells is to prevent pollution from occurring in the

future.   But, Underwriters contend that Section IIC provides coverage only to cover the **effects**

of the pollution, seepage and contamination.   The argument made was that "[i]t's not pollution

as long as it's in the well bore.   So what these wells are doing is not to remediate anything

caused by pollution." (Transcript of Hearing, Doc. 88 at 36).   Thus, Underwriters contend that

Section IIC(1) is only applicable for clean-up of the after effects of the seepage itself, and does

not cover actions to prevent seepage or pollution.   The Court finds such an interpretation

strained and unsupported by the plain language of the policy.

19

Parsing the language of subsection (a), that is omitting inapplicable language, provides clearly and unambiguously that Underwriters agreed to indemnify Taylor Energy for "all sums which the Assured shall by law . . . be liable to pay for the cost of remedial measures. . . caused directly by seepage, pollution or contamination arising from well insured herein."   "Remedial" means "affording a remedy: intended for a remedy or for the removal or abatement of a disease or of an evil." *Webster's Third International Dictionary* (1993).  Likewise, "remedy" means "something that corrects or counter acts an evil: corrective." *Id.* "Seepage" means "**1a** the act or process of seeping: oozing; **1b** a quantity of a fluid that has seeped through porous material. To "seep" means "to flow or pass slowly through fine pores or openings." *Id.*

The primary remedial measure or corrective action for seepage is to stop that seepage. Thus, the "cost of remedial measures" "caused by seepage" would include the cost of drilling the relief/intervention wells required to stop the seepage as underscored by the MMS/Coast Guard orders.  There is simply no question that Taylor Energy is required by law to pay for the cost of remedial measures (that is the drilling of these wells based on the decision sanctioned by the United States government under the law) to counteract the seepage arising from a well that was insured.  If the wells were not seeping, there would be no need for remedial measures. Once Taylor Energy incurs such costs, Underwriters are legally obligated to indemnify it.

### Subsection (b)

Likewise, parsing subsection (b), the Underwriters agreed to indemnify Taylor Energy for "the cost of or of any attempt at. . . nullifying seeping, polluting or contaminating

20

substances emanating from wells insured herein. . . ." Counsel argued that in order for Underwriters' duty to indemnify to arise under this provision, the seepage had to be out of the well bore and in the Gulf of Mexico; only costs to corral or obliterate the oil (e.g. dispersants) would be trigger a duty on the Underwriters' part.   (See Rec. Doc. 88, Transcript of Oral Argument, at 38).

This argument ignores and tortures the clear language of this provision. *Webster's Third International Dictionary* (1993) defines "nullify" as "**1** to make null; *Specif:* to make legally null and void. . . **2**: to make of no value or consequence: reduce to nothing; efface."  Again, to "seep" means "to flow or pass slowly through fine pores or openings." *Id.* Thus, there is coverage for the cost of  "reducing to nothing" those substances emanating from insured wells which flow or pass slowly through fine pores or openings.  Clearly, there is no other purpose for the wells in question but to reduce to nothing the seepage that is occurring as ordered by MMS to be accomplished by Taylor Energy.  Furthermore, the MMS December 5, 2007 directive  was not just about stopping the oil in the Gulf of Mexico but to stop further **soil** contamination; dispersants would not "nullify" further soil contamination. (Letter from MMS to Taylor Energy dated December 5, 2007, Doc. 36-2, page 10 of 16 ).  Underwriters' position is untenable. Accordingly,

**IT IS ORDERED** that Underwriters' Motion for Summary Judgment on Coverage (Doc. 22) is **DENIED.**

Based on the reasoning above,

**IT IS FURTHER ORDERED** that Taylor Energy Cross-Motion for Summary Judgment ( Doc. 53) is **GRANTED**.

Based on the Court's finding that the Policy was clear and unambiguous,

**IT IS FURTHER ORDERED** that Taylor Energy's Motion in Limine to Exclude parol Evidence is **MOOT**.

Finally, as concerns Underwriters' Motion for Summary Judgment on Plaintiff's Statutory Bad Faith Claims (Doc. 20), the Court finds there are material questions of fact precluding the granting of such motion.  This determination is supported in the Court's decision finding that coverage is clearly provided by the Policy combined with the facts and circumstances surrounding the denial of coverage.  For example, the fact that subsection (b) concerning coverage for "the cost of or of any attempt at. . . nullifying  seeping, polluting or contaminating substances emanating from wells insured herein. . . ." was never again mentioned in Underwriters' discussion concerning coverage.  Another example, is the omission of the "and/or" clause in counsel's letters denying coverage under subsection (a).  Accordingly,

22

**IT IS FURTHER ORDERED** that Underwriters' Motion for Summary Judgment on Plaintiff's Statutory Bad Faith Claims (Doc. 20) is **DENIED**.

New Orleans, Louisiana, this  day of October, 2010.

_____

**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**